**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In the Matter of                          :          Case No. 11-20255/JHW

Antonietta Antonelli                      :
d/b/a Westville Holdings, Inc.

                                          :          <u>**OPINION**</u>

              Debtor
_____

APPEARANCES:    Oren Klein, Esq.
                Parker McCay, P.A.
                P.O. Box 974
                Marlton, New Jersey  08053
                Counsel for Allan Goodman

                Mark Ford, Esq.
                Law Office of Mark W. Ford
                P.O. Box 110
                4 ½ North Broadway
                Gloucester City, New Jersey  08030
                Counsel for the Debtor

```
FILED
JAMES J. WALDRON, CLERK

January 30, 2012

U.S. BANKRUPTCY COURT
CAMDEN, NJ
BY:  s/ Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur
```

In this matter, Allan Goodman, Trustee of the Elisha R. Goodman Irrevocable Trust, a creditor in this bankruptcy, seeks to impose sanctions against the debtor and debtor's counsel for filing her bankruptcy case and various pleadings in connection with the case for improper purposes and in a vexatious manner.  The movant relies on Federal Rule of Bankruptcy Procedure 9011, 11 U.S.C. § 105, 28 U.S.C. § 1927, and the court's inherent powers. Because the circumstances of this case represent a substantial abuse of the bankruptcy process on the part of the debtor's attorney, the debtor will not be sanctioned, but the motion is granted and sanctions will be imposed as to debtor's counsel.

## **FACTS**

Antonietta Antonelli filed an individual Chapter 13 petition for bankruptcy on April 1, 2011.  The filing occurred at about the time that eviction proceedings were scheduled to be filed in New Jersey Superior Court against the debtor and her family in an attempt to evict them from their residence at 800 Gateway Boulevard in Westville, New Jersey ("the Property"). The bankruptcy filing represented the latest effort by the debtor and her family to delay or thwart state court foreclosure proceedings brought by the mortgagee against the Property.

The movant herein, Allan Goodman, Trustee of the Elisha R. Goodman Irrevocable Trust ("Trust"), holds the three mortgages on the Westville property. The Property was originally purchased as vacant land by Orion Business Management ("Orion"), a construction company of which the debtor's husband, Gino Antonelli, was the president and sole owner.  In March and April of 2006, during the construction of a building on the vacant land,[1] Mr. Antonelli borrowed a total of $250,000 from the Trust,[2] and executed two mortgages against the Property in favor of the Trust.  The mortgages and notes were signed by Mr. Antonelli, as president of Orion, and each mortgage debt was

---

[1]    Mr. Antonelli testified that zoning changes by the municipality compelled a change in construction from the intended commercial structure to a residential use.

[2]    The first mortgage was for $75,000 and the second was for $175,000.

personally guaranteed by both Mr. and Mrs. Antonelli.   Mrs. Antonelli did not sign the mortgages.

At some point, Orion ceased its operations.   Mr. Antonelli was also the sole owner of Westville Holdings, Inc. ("Westville"), and in July of 2006, he caused Orion to transfer the Property to Westville for $1.00; the deed was recorded in August 2006.  (Exh. P-A, 4/13/2011).  In February 2008, Mr. Antonelli, acting this time in his capacity as president of Westville, borrowed an additional $100,000 from the Trust and executed a third mortgage against the Property in favor of the Trust.  Again, Mr. and Mrs. Antonelli guaranteed repayment, but Mrs. Antonelli did not sign the mortgage.  An assignment of rents was included as an attachment to this 2008 mortgage.

At some point, the Antonellis moved into the Property.  The mortgages on the Property went into default in April of 2008.[3]  In July of 2008, Mrs. Antonelli filed for Chapter 7 bankruptcy, case number 08-23644/JHW.  She was represented by Mark Ford, Esquire.  Neither the Trust nor Westville was listed as a creditor or otherwise mentioned in Mrs. Antonelli's schedules.  In November 2008, Mr. Antonelli transferred ownership of Westville to his wife. (Exh. P-B, 5/26/2011).  Mrs. Antonelli received a Chapter 7 discharge on December 19, 2008 and her case was closed on December 29, 2008.

---

[3]   All three notes to the mortgages have 60-month balloon clauses that are referenced in the mortgages themselves.  The first note was dated March 21, 2006, and therefore would have been due in full on March 21, 2011.

3

On August 23, 2010, the Trust commenced a foreclosure proceeding against the Property in the New Jersey Superior Court, Gloucester County, Chancery Division, followed by a motion, filed in the foreclosure action on October 29, 2010, to appoint a rent receiver.  On December 1, 2010, two days prior to the hearing on that motion, Mr. Antonelli filed for bankruptcy, case number 10-47276/JHW.  He was also represented by Mr. Ford.

In Schedule A of Mr. Antonelli's Chapter 7 petition, he claimed a "tenancy interest" in the Property valued at $10,100.00.  Schedule G, governing Executory Contracts and Unexpired Leases, indicated that the property was leased from Orion.  On December 12, 2010, the Trust filed a motion in bankruptcy court for relief from the automatic stay as to the Property.  By correspondence directed to the Honorable James E. Rafferty, J.S.C., the Superior Court judge before whom the foreclosure action was pending, Mr. Ford requested a stay of the foreclosure action against the Property while Mr. Antonelli's bankruptcy case was open.  Appended to the correspondence was an affidavit from Mr. Antonelli in which he recited his unsuccessful attempts to date to negotiate a resolution of the defaulted mortgages with the Trust, and stated the following:

> We [my wife and I] will try to make a final offer [to resolve the outstanding loan balances due to the Trust] in January of 2011.  Should this fail, my wife will file a chapter 13 at the appropriate time, to see if we could resolve the outstanding issues in Federal Court.

Ex. P-14, 4/13/2011.

On January 12, 2011, this court granted the Trust relief from the automatic stay as to Mr. Antonelli to pursue the state law action against the Property.[4]  On March 18, 2011, the debtor received a Chapter 7 discharge and his case was closed on March 24, 2011.

After receiving relief from the automatic stay, the Trust continued to pursue the foreclosure action against the Antonellis in state court.  On January 21, 2011, the Superior Court of New Jersey, Gloucester County, Chancery Division appointed Goodman Burlington Properties, L.L.C., of which Mr. Goodman is the manager, as the rent receiver.  (Exh. P-F, 5/26/2011).  Mr. Goodman then proposed a new leasing arrangement with the Antonellis which would have continued their "tenancy" if they had agreed to pay $1,600 each month plus all past due rents and a security deposit of unknown amount. (Exh. D-2, 4/13/2011).  The Antonellis were informed that if they did not sign the new lease, their month-to-month lease would terminate on March 31, 2011, and an eviction action would be commenced thereafter.  The proposed lease was not signed, and an eviction action was filed by the rent receiver in the Superior Court of New Jersey, Gloucester County, Law Division on April 8, 2011.

---

[4]    The order states that "any future bankruptcy filing by debtor(s), Gino Antonelli and/or any other individual or entity claiming an interest of any kind whatsoever in the aforesaid realty shall not operate to stay" state law foreclosure proceedings.  Order Granting Relief, dated 1/12/2011.  In court, it became apparent that Ms. Antonelli did not receive notice of the motion for relief from the stay, and therefore the court orally held that prospective relief would not apply to her.

One week prior to the filing of the eviction action on April 1, 2011, Mrs. Antonelli filed this Chapter 13 bankruptcy.[5]  The petition reflected that the debtor was filing not only in her individual capacity, but also "dba Westville Holdings, Inc."  She listed the Property on her Schedule A, "Real Property", as "Equitable own, 100%", with a value for her ownership interest of $0.00 and a $468,027.00 mortgage.  The Trust was listed as a secured creditor on the Property with a mortgage of $468,027.00.  On Mrs. Antonelli's Schedule B, "Personal Property," Westville Holdings was listed with the same address as the Property and with a value of "$0.00."  No other secured creditors were listed; the debtor listed "Westville Boro" as an unsecured priority creditor with a claim of $1,100.00 for taxes, water, and sewer.  The only unsecured creditor listed was Wharton Hardware, with a claim of $0.00.

The debtor's Chapter 13 plan proposed to pay $100.00 per month for the 60 month life of the plan, and to pay "the regular monthly mortgage payments" pending a refinance of the Trust mortgage by November 2011.[6]  The plan contained a motion to bifurcate the mortgage debt on the Property into secured ($228,000.00) and unsecured ($240,027.00) claims, and to void the unsecured portion of the Trust's lien.  As well, the debtor sought to "reaffirm" her lease with Westville Holdings, executed on or about the day she filed her Chapter 13

---

[5]  When the eviction action was filed on April 8, 2011, the rent receiver did not have notice of the bankruptcy filing.

[6]  In Part 4 of the Debtor's Chapter 13 Plan, under the "Modification" section, the Debtor noted, apparently erroneously, that she intended to pay the Trust "0" on its claim.

case, and proposed to pay $880.00 each month to the Trust outside the Plan.

Notwithstanding the fact that the debtor does not qualify for a Chapter 13

discharge in this case because she received a Chapter 7 discharge in 2008, she

nevertheless noted on her Chapter 13 plan that she seeks a discharge in this

case.

Shortly after the filing, on April 13, 2011, the Trust filed a motion

seeking (1) a declaration that the Property was not part of the bankruptcy

estate; (2) an order granting relief from the stay nunc pro tunc as of April 1,

2011 as to the Property; and (3) a determination that any future bankruptcy

filings of the debtor would not affect the relief from that stay.  In its motion, the

Trust argued that because title to the Property is vested in the name of

Westville Holding, Inc., the debtor does not have any equitable or property

interest in the Property.  The entire history of the outstanding notes due from

the debtor and her husband to the Trust was recited, including:  that the notes

went into default in 2008; that a foreclosure complaint was filed in August

2010; that two days prior to the return date of the Trust's motion to appoint a

rent receiver, Mr. Antonelli filed a Chapter 7 case; that relief from the stay was

granted to the Trust in January 2011; that a rent receiver was appointed, and

that the debtor filed this Chapter 13 shortly before the rent receiver filed an

eviction action in state court.  The Trust contended that based on this history

and other aspects of the case, including the fact that the Trust is the only real

creditor in the case, that the debtor's employment as a "Project Manager" and

her asserted lease with Westville Holdings, Inc. are highly suspect, that she is
not entitled to a Chapter 13 discharge, and that her proposed plan to cram
down the Trust mortgages is legally impermissible, the debtor filed her case in
bad faith, and the filing served only to unduly burden and delay the Trust with
its foreclosure and eviction action.

Besides a noncommittal response to the motion, in which she neither
admitted nor denied most of the allegations made by the Trust in the motion,
the debtor submitted a certification acknowledging that she was not eligible for
a discharge in this case, and that the notation in her Chapter 13 plan that she
was seeking a discharge was a "mistake."

At the hearing held on April 25, 2011,[7] the ownership of the Property
was discussed, with Mr. Ford contending that the debtor's ownership of 100%
of the shares of Westville Holding, Inc. qualified her as "the 100 percent
equitable owner of the property."[8]  Counsel for the Trust noted that the debtor
did not sign the mortgages, that there were no other creditors, that the debtor
seeks to impermissibly modify the mortgages held by the Trust, and that the
debtor is not entitled to a discharge.  In response to questioning from the court
about whether the filing was simply aimed at thwarting the eviction process,
particularly in light of the debtor's nominal income, Mr. Ford responded that

---

[7] The hearing was scheduled on shortened time, twelve days after the
motion was filed.

[8] T2-13 (4/25/11).

8

notwithstanding the fact that Mr. Antonelli's petition, filed four months earlier, reflected no income for Mrs. Antonelli (the debtor herein), and only $850.00 in Social Security income for Mr. Antonelli, the couple now had an income of $4,345.00 per month (Mr. Antonelli with $1,800.00 in Social Security income, and Mrs. Antonelli with $445.00 in Social Security income and $2,100.00 as a Project Manager).[9]  Focusing on the debtor's asserted position as a Project Manager, the court asked Mr. Ford about "the degree of reasonable inquiry he made regarding this project manager status,"[10] but Mr. Ford did not respond in a definitive way.  The court ultimately granted relief from the stay based on the "myriad of reasons" that the Trust's counsel had recited in his papers.[11]

On May 4, 2011, the debtor filed a motion to reinstate the automatic stay.  The debtor's one-page certification stated that she is employed by CB's Electronic Contracting, Inc. as of the "beginning of April" and would, therefore, be able to "catch up" on her arrearages.  She attached two uncashed personal checks from the company, one for "4/1 & 4/6" for "bookkeeping", in the amount of $1,125.00, and one for the "week of 4/14 and 4/21", also for "bookkeeping", in the amount of $1,100.00.

---

[9]  The debtor's Schedule I designates "SSD", but Mr. Ford acknowledges that the debtor is receiving Social Security benefits rather than Social Security Disability benefits.

[10]  T7-4 (4/25/11).

[11]  T8-22 (4/25/11).

In response to the motion to reinstate, the Trust questioned the
procedural defects of the motion, and argued that no grounds for
reconsideration had been advanced.  The Trust also questioned the fact that
the debtor's employment, which was reflected in the debtor's B22C "means
test" filing as having been effected during the six months preceding the filing,
was now asserted to have commenced on or about April 1, 2011, and was
characterized as "bookkeeping", rather than as "project manager".

The Trust's response to the debtor's motion to reinstate the stay was
followed by three supplemental certifications and two briefs filed by the debtor
in further support of her motion.  At first, the debtor focused on arguments
that her financial condition had improved from what was contemplated at the
time the petition was filed, and that she actually had an equitable interest in
the property that should warrant recognition that the automatic stay must be
reimposed.  As to the debtor's financial condition, notwithstanding the fact that
her employment was noted in the petition, with a salary designated at
$2,100.00 per month as a "project manager", Mr. Ford asserted in his brief
submitted May 26, 2011 that the "Debtor has a new paid position as a
bookkeeper and seeks to make payments for rent related to the *rem*.  This
information was not presented on April 25, 2011 . . . ."  Mr. Ford argued that
the "Debtor acted quickly to provide facts that were inadvertently not disclosed
to her counsel prior to the April 25, 2010 (sic) hearing and which due to
mistake were not inquired to by her counsel as he was unaware of her new

10

working situation and barely had any time to conduct any such inquiry due to the shortened schedule put in place by this Court." (Letter of May 26, 2011, at 5-6). According to Mr. Ford, "[t]he existence of Debtor's employment was not discovered" until after the April 25, 2011 hearing, and "introduction and consideration of the new employment evidence will lead to a different result – that Debtor can afford to pay the Goodman (sic)". Id. at 7.

As to the issue of the debtor's equitable interest in property, Mr. Ford argued that "it was not sufficiently clear that the issue of Debtor's equitable interest in the relevant *rem* . . . [was] to be a contested issue at the April 25, 2011 hearing such that she was on notice that these issues would be material and require introduction of the evidence which now serves as the basis of the present motion." Id. at 6.  There is no indication of the new "evidence" on the issue of the debtor's equitable interest.  The debtor's argument in this regard morphed in a later submission in which Mr. Ford "concede[d] that counsel for Goodman has cited numerous foreign precedents which support its position that ownership of stock in a company does not convert the company's assets into assets of the bankruptcy estate." (Letter of May 31, 2011, at 1).  Mr. Ford then converted the argument into a quest to recognize that the automatic stay applied to the non-debtor Westville Holding, Inc. in light of the identity between the debtor and Westville Holding, Inc. and the negative impact upon the debtor's ability to reorganize if the stay did not apply, citing to Nevada Power

<u>Co., v. Calpine Corp.</u> (<u>In re Calpine</u>), 365 B.R. 401 (S.D.N.Y. 2007) and

<u>Queenie, Ltd. v. Nygard Int'l</u>, 321 F.3d 282 (2ᵈ Cir. 2003).


At the hearing for reconsideration, the court determined that there was

"no new item that would warrant reconsideration."[12]  The court further rejected

Mr. Ford's theory that the debtor had an opportunity to extend the stay to a

non-debtor third party, here, Westville Holding Inc., based on the debtor's

ownership of the company, distinguishing the cases Mr. Ford relied upon as

Chapter 11 cases.[13]  In any event, the real question posed was not whether the

stay extended to protect the *rem* titled to Westville Holding Inc., but rather

whether the relief from the stay afforded to the Trust against the debtor should

be reconsidered.  The Court readily determined that the initial ruling should

not be disturbed.


In the interim, immediately after the filing of the debtor's reinstatement

motion, the Trust's counsel, Oren Klein, Esquire, sent a "safe harbor" letter to

Mr. Ford, dated May 4, 2011, informing Mr. Ford that Mr. Klein would institute

a motion for sanctions under 11 U.S.C. § 105 and Federal Rule of Bankruptcy

Procedure 9011 if Mr. Ford did not withdraw the motion to reinstate.  Mr. Klein

---

[12]    T6-5 to 6 (5/31/2011).

[13]    T8-20 to 9-7 (5/31/2011).  It is parenthetically noted that the
conclusion drawn in <u>Queenie, Ltd. v. Nygard Int'l</u>, 321 F.3d 282 (2d Cir. 2003),
that the automatic stay imposed upon the filing of an individual Chapter 11
case applied as well to the individual debtor's wholly owned corporation has
been seriously questioned.  <u>See</u> <u>In re Calpine Corp.</u>, 365 B.R. 401, 408-09
(S.D.N.Y. 2007).

asserted that the debtor's income, or lack thereof, did not control the result of the motion for relief from the stay, but that a series of other factors, including the debtor's lack of interest in the Property, were more germane.  In addition, Mr. Klein highlighted a series of factual inconsistencies in the debtor's case to Mr. Ford.

The Trust filed this motion for sanctions on May 26, 2011 contending that the debtor abused the bankruptcy process by filing her case, because the dispute is a two party dispute and there is no hope of reorganization.  The creditor believes that the bankruptcies filed by the debtor and her husband, as well as all of the pleadings filed in both cases, were solely a delay tactic used to keep the debtor(s) in the Property for as long as possible.  Therefore, the creditor seeks sanctions against Mrs. Antonelli and Mr. Ford under Rule 9011, 28 U.S.C. § 1927, 11 U.S.C. § 105, and the court's inherent powers.[14]

The debtor objected to the motion for sanctions on June 13, 2011.  The original objection consisted of a certification by Mr. Antonelli that addresses his

---

[14]    The Trust also sought sanctions against Mr. Antonelli and Mr. Ford in connection with Mr. Antonelli's Chapter 7 filing.  The court declines to address Rule 9011 sanctions for the filing of Mr. Antonelli's petition because Mr. Antonelli's case has been closed for several months, and no such relief was sought in his case.  As well, we are mindful of the Third Circuit supervisory rule articulated in Mary Ann Pensiero, Inc. v. Lingle.  847 F.2d 90, 100 (3d Cir. 1988) ("we adopt as a supervisory rule for the courts in the Third Circuit a requirement that all motions requesting Rule 11 sanctions be filed in the district court before the entry of a final judgment.").  In the spirit of that same rule, we will not address sanctions for Mr. Antonelli's petition under either §105(a), the court's inherent powers, or 28 U.S.C. § 1927.

business activities as a contractor, apparently submitted to tout his past

accomplishments and to suggest that there are prospects for future income for

the family from outstanding project bids and contracts.  Mr. Ford then filed a

brief on June 24, 2011, in which he asserts that he did not file the bankruptcy

and subsequent motions in bad faith, but rather relied on the cases cited in his

letter brief in forming the opinion that the debtor would, as an owner of the

corporation, be able to have the property included in the bankruptcy estate.

The court held a hearing on the motion for sanctions on June 27, 2011,

at which both the debtor and her husband confirmed that the purpose of the

filing was to stop the eviction process and to continue to attempt to work out a

deal with the Trust to repay the obligations due.[15]  Both the debtor and her

husband reacted with surprise at the terms of the Chapter 13 plan that was

filed on the debtor's behalf, which provided for refinancing within six months of

the filing.  Mr. Antonelli candidly acknowledged that accomplishing a refinance

in six months was akin to "dreaming,"[16] and that a more realistic refinancing

might occur through an FHA loan obtained during the bankruptcy after two

years of payment.  It was only when Mr. Ford suggested the possibility that the

property could be sold to a cash buyer more promptly that Mr. Antonelli

testified that he could "close the deal within probably 3 to 6 months."[17]

---

[15]  E.g., T14-11, T80-6 (6/27/2011).

[16]  T29-11

[17]  T64-16 through 17 (6/27/2011).

14

Also under scrutiny during the hearing were the bona fides of the debtor's reported employment. On Schedule I, the debtor reported monthly income as a "Project Manager" of $2,100.00. Mr. Antonelli testified that because he knew that Mrs. Antonelli had to show some income beyond Social Security benefits to make ongoing payments toward her obligations in the Chapter 13 plan, he asked an acquaintance who had worked with him as a subcontractor if he could use Mrs. Antonelli. She started to work on or about April 1, 2011, the same day the petition was filed. Although Schedule I reflects her position as a "Project Manager", she actually worked as a bookkeeper. She worked from home on a part-time basis, earning $25.00 an hour and working approximately 20 hours a week. She received two checks from her employer in April, and two checks in May. The April checks were not cashed until some time in May, with the debtor explaining that she did not bother to cash the checks until the cash was needed. (Third Suppl. Certif. at 2, ¶8). Following the denial of the debtor's motion to reinstate the stay as to the creditor, the debtor ceased her employment. Her husband claimed that he needed her help in presenting bids for his contracting business.[18]

---

[18]    Mr. Antonelli's contracting business, CCI Corporation, was owned by Mr. Antonelli's son, who was actually never involved in the company.

The hearing also served to highlight multiple inaccuracies in the various filings submitted on behalf of the debtor.[19]  For instance, on the debtor's Schedule I, Mr. Antonelli's Social Security benefit is listed as $1,800.00 for each month.  Mrs. Antonelli confirmed that this figure was incorrect, and that her husband received a maximum Social Security benefit of $988.00 each month.[20]  For the first time at the hearing, Mr. Ford sought to explain this discrepancy by reflecting that Mr. Antonelli just reminded him that he received $800.00 per month from his brother as ongoing assistance, a source of income that had never been mentioned before anywhere.[21]

Another example of a blatant inaccuracy was noted on Form B22C, Mrs. Antonelli's means test form, which requires the notation of the debtor's average monthly income during the six months prior to the filing.  Mrs. Antonelli's B22C Form noted an average monthly income from wages of $2,100.00 a month from her work as a "Project Manager", yet the testimony confirmed that Mrs. Antonelli only began her employment in April 2011, and that she had no income from any source other than Social Security during the 6-month period prior to the filing.  It is also noted that she worked only as a bookkeeper and not as a "Project Manager" during this time.

_____

[19]   Inaccuracies were also noted in Mr. Antonelli's case, including the reflection in his Schedule G, which he denied that he ever saw, that he leased the Property from Orion.

[20]   T80-1 (6/27/2011).

[21]   T90-3 to 9.

16

A third example of an inaccuracy was noted in Mrs. Antonelli's Schedule
J, which indicated payments of $17.92 each month to Westville Holdings.  Mrs.
Antonelli had no idea what this payment might be, particularly because the
lease with Westville Holdings, prepared and executed by Mrs. Antonelli,
required payments to Westville Holdings of approximately $1,800.00 each
month.[22]

Against this backdrop of allegations that the debtor filed her Chapter 13
case in bad faith, as a delay tactic to prevent eviction, with no reasonable
prospect of reorganization, coupled with the discrepancies, inaccuracies and
misrepresentations evidenced by the pleadings filed, the creditor seeks to
sanction the debtor and her counsel, and to shift to them the cost of
responding to these deeply flawed pleadings.

## **DISCUSSION**

The creditor has brought its motion under Rule 9011 of the Federal
Rules of Bankruptcy Procedure, section 105 of the Code, the court's inherent
powers, and 28 U.S.C. § 1927.  Each of these provisions will be discussed in
turn.

---

[22]   Schedule I reflects a monthly rental charge of $933.33 and monthly
real estate taxes of $800.00, which nearly equal the monthly rental noted in
the lease.  However, the charge of $17.92 per month to Westville is
unexplained.

I.   Rule 9011.

Rule 9011 of the Federal Rules of Bankruptcy Procedure states that:

By presenting to the court (whether by signing, filing, submitting,
or later advocating) a petition, pleading, written motion, or other
paper, an attorney or unrepresented party is certifying that to the
best of the person's knowledge, information, and belief, formed
after an inquiry reasonable under the circumstances,--

(1) it is not being presented for any improper purpose, such
as to harass or to cause unnecessary delay or needless
increase in the cost of litigation.

(2) the claims, defenses, and other legal contentions therein are
warranted by existing law or by a nonfrivolous argument for the
extension, modification, or reversal of existing law or the
establishment of new law;

(3) the allegations and other factual contentions have evidentiary
support or, if specifically so identified, are likely to have evidentiary
support after a reasonable opportunity for further investigation or
discovery; and

(4) the denials of factual contentions are warranted on the evidence
or, if specifically so identified, are reasonably based on a lack of
information or belief.

FED. R. BANKR. P. 9011(b).  If the court determines that section (b) has been

violated, it may impose sanctions "upon the attorneys, law firms, or parties

that have violated subdivision (b) or are responsible for the violation."  FED. R.

BANKR. P. 9011(c).

18

For conduct to be sanctionable, the offending attorney must receive

notice of the impending sanctions.  Where sanctions are sought by a motion,

the rule requires that the offending attorney be sent a "safe harbor" letter.

> The motion for sanctions may not be filed with or presented to the
> court unless, within 21 days after service of the motion (or such
> other period as the court may prescribe), the challenged paper,
> claim, defense, contention, allegation, or denial is not withdrawn or
> appropriately corrected, except that this limitation shall not apply
> if the conduct alleged is the filing of a petition in violation of
> subdivision (b).

FED. R. BANKR. P. 9011(C)(1).  The creditor's counsel sent debtor's counsel a

letter twenty-two days before filing the motion for sanctions; the letter informed

Mr. Ford of Mr. Klein's intent to file a motion for sanctions if the motion to

reinstate was not withdrawn.  However, the rule requires the actual motion,

not a letter, to be served upon opposing counsel 21 days prior to the motion's

filing for compliance with the rule.  FED. R. BANKR. P. 9011(C)(1).  Courts have

held that such informal process is insufficient to comply with Rule 9011.  In re

Pratt, 524 F.3d 580, 586-87 (5th Cir. 2008) (citing Brickwood Contractors, Inc.

v. Datanet Eng'g, Inc., 369 F.3d 385, 389 (4th Cir. 2004); Gordon v. Unifund

CCR Partners, 345 F.3d 1028, 1030 (8th Cir. 2003) (denying Rule 11 sanctions

because the defendant sent informal letters to the plaintiff instead of a copy of

the motion for sanctions); Radcliffe v. Rainbow Constr. Co., 254 F.3d 772, 789

(9th Cir. 2001)).  But see DiPaolo v. Moran, 407 F.3d 140, 145 (3d Cir. 2005)

(where party defaulted on Rule 11 motion, district court could consider safe

harbor defense waived); Nisenbaum v. Milwaukee County, 333 F.3d 804, 808

(7th Cir. 2003) (stating that magistrate judge improperly refused to consider

19

Rule 11 violation when party sent a letter to opposing counsel, and then informed opposing counsel of the error and provided an additional 21 days respite).

Therefore, the court is curtailed in its opportunity to impose Rule 9011 sanctions based on the filing by debtor's counsel of the motion to reinstate. The matter would end there, were it not for the last clause of Rule 9011(c), which provides that the safe harbor letter need not be sent if a party seeks sanctions for the filing of a petition.  See also FED. R. BANKR. P. 9011 Advisory Committee Note (1997) ("The 'safe harbor' provision contained in subdivision (c)(1)(A) . . . does not apply if the challenged paper is a petition.").  The petitioner's motion asserts that the debtor and her counsel had an improper purpose in filing not only the motion to reinstate but also the bankruptcy petition, which the petitioner asserts was filed in bad faith.

Rule 9011 is designed to discourage pleadings that are "'frivolous, legally unreasonable, or without factual foundation.'"  Haymaker v. Green Tree Consumer Discount Co., 166 B.R. 601, 606 (Bankr. W.D. Pa. 1994) (quoting Lieb v. Topstone Indust., 788 F.2d 151, 157 (3d Cir.1986) (discussing Rule 11 of the Federal Rules of Civil Procedure)).  Under Rule 9011(b)(1), an attorney is certifying to the court that the petition was not filed for an improper purpose. The attorney must reach this conclusion based on "an inquiry reasonable under the circumstances." FED. R. BANKR. P. 9011(b).  If these requirements are

violated, sanctions may be imposed.  FED. R. BANKR. P. 9011(c).  Here, we must

first determine whether the petition was filed for an improper purpose and, if

so, whether a reasonable inquiry was conducted to make that determination.


      A.    Improper Purpose.


    Courts have employed Rule 9011 to sanction bankruptcies filed for an

"improper purpose" where the petition is filed in bad faith, or where the only

purpose of filing is to hinder or delay creditors.  E.g., In re Bourroughs, No. 00-

20381, 2000 WL 1835304, 240 F.3d 1074, *1-2 (5th Cir. Nov. 30, 2000)

(upholding Rule 9011 sanction where the bankruptcy judge found that the

petition was filed in bad faith, with intent to hinder and delay creditors and

without any hope of reorganization); In re Silberkraus, 336 F.3d 864, 871 (9th

Cir. 2003) (upholding sanctions under Rule 9011 improper purpose prong

where the bankruptcy court found that the petitioner filed in bad faith to avoid

state court action); In re MRL Residential Leasing, Inc., 1997 WL 453163, 121

F.3d 709, *3 (6th Cir. Aug. 8, 1997) (a petition filed in bad faith is sanctionable

when the attorney or party is in a position to know that the filing was in bad

faith); In re Coones Ranch, Inc., 7 F.3d 740, 742 (8th Cir. 1993) (upholding

sanctions where the bankruptcy court found the petition was filed without any

hope of reorganization and for the purpose of avoiding the result of a state

court decision); Cinema Serv. Corp. v. Edbee Corp., 774 F.2d 584, 586 (3d Cir.

1985)(upholding Rule 9011 sanctions where the bankruptcy judge found that

the petition was filed not to reorganize but solely to delay a single creditor with

a state court judgment); In re Schaeffer Salt Recovery, Inc., 444 B.R. 286, 295

(Bankr. D.N.J. 2011) (applying Rule 9011 sanctions where the debtor filed for

no purpose other than to delay a tax foreclosure).[23]


The Third Circuit has held that, for purposes of dismissal under §

1307(c), an assessment of bad faith must be made on "a case-by-case basis in

light of the totality of the circumstances." In re Lilley, 91 F.3d 491, 496 (3d

Cir. 1996). This is a fact-intensive determination and one in which the

bankruptcy court has discretion.  In re Myers, 491 F.3d 120, 125 (3d Cir.

2007).  While courts have considered a series of factors in determining whether

a filing was made in bad faith,[24] the Third Circuit has expressly stated that the

---

[23]   The debtor in Schaeffer Salt Recovery had filed a Chapter 7 petition
five weeks after its Chapter 11 petition was dismissed for bad faith.  In re
Schaefer Salt Recovery, Inc., No. 04-36630(NLW), 2006 WL 2788258, *1 (D.N.J.
Sept. 27, 2006).  The bankruptcy court initially refused to apply Rule 9011
sanctions because it believed the supervisory rule, as articulated in Mary Ann
Pensiero, Inc. v. Lingle, 847 F.2d 90 (3d Cir. 1988), applied.  In re Schaefer
Salt, 2006 WL 2788258, at *2.  This rule states that a motion for sanctions
must be filed prior to an entry of a final judgment if the motion arises out of
conduct that occurred before the entry of the final judgment.  In re Schaefer
Salt Recovery, Inc., 542 F.3d 90, 97 (3rd Cir. 2008).  The Third Circuit held that
the supervisory rule did not apply because the entry of dismissal was based
upon a voluntary dismissal by the debtor.  Id. at 98.  We note that the
supervisory rule would not apply in this case, because the motion for sanctions
was filed before the motion to reinstate was heard and, in any case, a ruling on
relief from the automatic stay is not a final judgment.  In re Mullarkey, 536
F.3d 215, 226-27 (3d. Cir. 2008).

[24]   Factors to determine whether a filing is made in bad faith include:

  (1) The nature of the debt;
  (2) The timing of the petition;

bankruptcy courts may reasonably find bad faith when "'the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose.'" Id. (quoting In re Dami, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994)).

Here, when one considers the circumstances of the debtor's bankruptcy, it becomes clear that the petition was filed for no other purpose than to delay the eviction proceedings to be initiated by the Trust and to prolong the opportunity of the debtor and her family to remain in the Property for as long as possible without meaningful means to reorganize in a Chapter 13 case. The indicia of bad faith are numerous. The only true creditor is the Trust.[25] The timing of the filing is obviously intended to thwart or at least delay eviction proceedings. The obligations to the Trust guaranteed by the debtor and her husband were in default since April 2008. A foreclosure complaint was filed in August 2010. The debtor's husband, represented by Mr. Ford, filed a Chapter 7 petition shortly before a receiver was to be appointed in state court for the

---

(3) How the debt arose;
(4) The debtor's motive in filing the petition;
(5) How the debtor's actions affected creditors;
(6) The debtor's treatment of creditors both before and after the petition was filed; and
(7) Whether the debtor has been forthcoming with the bankruptcy court and the creditors.

In re Goddard, 212 B.R. 233, 238 (D.N.J. 1997) (citing In re Lilley, 91 F.3d at 496; In re Love, 957 F.2d 1350, 1357 (7th Cir. 1992)).

[25] The Borough of Westville is named as a creditor for past due real estate taxes, but taxes have been paid routinely by the Trust. A single unsecured creditor, Wharton Hardware, is listed, astonishingly so, as holding a claim of "$0.00".

Property.  This filing occurred on the day that eviction proceedings were scheduled to be filed against the debtor and her family.

The petition and schedules of the debtor also point to bad faith, presenting frivolous and legally unsupportable representations. Notwithstanding the basic and well known proposition that only an individual (rather than a corporation or a partnership) may file a Chapter 13 case, see 11 U.S.C. § 109(e), the debtor filed not only as an individual, but also "dba Westville Holdings, Inc."  Since the Property was titled to Westville Holdings, Inc., the listing of the corporation as an alternate name used by the debtor was obviously a frivolous attempt to maximize the impact of the automatic stay.  As well, the debtor is listed on Schedule A – Real Property as the "equitable owner" of the Property, notwithstanding the basic proposition, acknowledged by Mr. Ford later in the case, that ownership of stock in a corporation does not translate to ownership, either equitable or legal, of the assets of the corporation.  A further inconsistency is found in Schedule G, which lists a lease between the debtor, noted elsewhere as the equitable owner of the Property, and Westville Holdings, Inc., which lease was coincidentally entered into on the day of the Chapter 13 filing.  The inaccuracies and inconsistencies outlined above in the schedules submitted with the petition serve to compound the impression that the filing was thrown together by counsel with little attention paid to the accuracy or bona fides of the information presented.

Also suspect here, and adding to the indicia of bad faith in filing the petition, is the description of the income of the debtor and her husband in Schedule I.  The debtor's husband's income from Social Security is listed as $1,800, but the debtor testified that her husband has never received more than $988 per month from that source.  Of greater concern is the indication in Schedule I that the debtor earns income of $2,100 per month as a "Project Manager", with no listing of her employer.  As we came to know, the debtor was hired by an acquaintance of her husband, a subcontractor with whom he occasionally had worked, as a bookkeeper, starting at about the time the petition was filed.  She worked from her own home, at the rate of $25 an hour. She did not cash the checks she received in April, the month she filed for bankruptcy, until weeks after she received them.  She stopped working when her case was dismissed.  The debtor's husband testified that he understood the need to show sufficient family income to buttress an argument that the debtor could implement a potentially feasible plan.  The picture emerging from these facts is that the debtor's "job" was simply a ploy to show increased income for as long as the automatic stay would serve to delay eviction proceedings against the debtor's family.

The most obvious and egregious indication of the bad faith of debtor's filing is her Chapter 13 plan.  She proposed to pay $100 per month for 60 months, with a refinance of the Property by November 2011.  Obviously, without much income and with a property that is substantially undersecured,

the prospect of refinancing the property within seven months of the filing was rather dim.  In fact, when debtor's husband testified, he was surprised by the refinancing provision, characterizing the likelihood of success as: "dreaming".[26]  The Plan also proposed to "continue regular monthly payments" pending the refinance (even though no regular monthly payments were specified under the debtor's guarantee obligation, nor could they be made in light of the maturity date of the obligation in March 2011), to pay the Trust "adequate protection payments" of $880 per month, and to reaffirm the lease with Westville Holdings, Inc. (entered into on or about the day of the filing). These provisions are internally inconsistent and nonsensical.  The Plan also proposed to modify the Trust's claim into 2 parts:  a secured portion equaling the value of the collateral at $228,000, and an unsecured portion of $240,000, notwithstanding the fact that the debtor is not the title owner of the Property and has no authority to seek a modification of the mortgage.  Even if the debtor held legal title to the Property, the debt appears to be secured only by a security interest in real property that is the debtor's principal residence, in which case modification is proscribed under 11 U.S.C. § 1322(b)(2).  Finally, the debtor indicated on her Chapter 13 plan that she sought a Chapter 13 discharge, for which she was ineligible because she had received a Chapter 7

---

[26]  T29-11 (6/27/11).  When initially asked about the plan, Mr. Antonelli stated that there was "no way" that the property could be refinanced in such a short amount of time.  T 29-23 (6/27/2011).  After being shown the plan, Mr. Antonelli stated that "we could refinance it, but certainly not by 11-11.  That's a stretch.  It's possible.  Nothing's impossible."  T32-15 through 17 (6/27/2011).

discharge in 2008.  <u>See</u> 11 U.S.C. § 1328(f)(1).  This mistake was corrected only

after the Trust noted the problem in a submission to the court.


The conclusion is inescapable in this case, by the nature of the debt, the

timing of the petition, and the extraordinary treatment of the debt in the

petition and Chapter 13 plan, that the petition was filed in bad faith and for no

purpose other than to delay the only secured creditor.  My conclusion is

supported by the pre-petition actions of the debtor and her husband, also

represented by Mr. Ford, as evidenced most recently by the Chapter 7 filing of

Mr. Antonelli, several months before the debtor's filing, which served to hinder

the creditor's foreclosure proceedings in state court.  The record herein reflects

that at the time Mr. Antonelli's case was filed, Mr. Ford was contemplating a

Chapter 13 case to be filed by Mrs. Antonelli.  He waited until eviction

proceedings were to be filed by the creditor in state court to file the Chapter 13

case for her.


Having determined that the debtor's petition was filed for an improper

purpose, we now turn to whether a reasonable inquiry was conducted to

evaluate whether the filing was not for an improper purpose.


      B.     Reasonable Inquiry.

Even if the bankruptcy was filed for an improper purpose, the filing of the petition is not automatically grounds for sanctions. Rule 9011(b) does not require all pleadings to be the model of perfection, but requires only that a signing entity have determined that the petition was not filed for an improper purpose "to the best of the person's knowledge . . . formed after an inquiry reasonable under the circumstances." FED. R. BANKR. PRO. 9011(b). The Third Circuit has defined reasonableness as "'an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact.'" In re Taylor, 655 F.3d 274, 284 (3d Cir. 2011) (quoting Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 289 (3d Cir. 1991)). The duty of reasonable inquiry is determined objectively. In re Amoroso, 123 Fed. Appx. 43, 47 (3d Cir. 2004) (citing Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc., 57 F.3d 1215, 1227-28 (3d Cir.1995)). When considering whether to impose sanctions under Rule 9011, a court "should consider the reasonableness of the inquiry under all the material circumstances." In re Taylor, 655 F.3d at 284.

While the motion filed by the Trust here seeks sanctions against both the debtor and the debtor's counsel, the focus is on the debtor's counsel, Mr. Ford. After hearing from the debtor and her husband about the circumstances of the filing, I am convinced that the debtor was advised to file at the time and in the way she did by Mr. Ford, who completed the petition and schedules for her, and who submitted the Chapter 13 plan, the terms of which actually surprised

the debtor and her husband on the stand.  "[A]s to matters of law the

reasonableness of a client's signing of a paper may be based on advice of

counsel." Estate of Calloway v. Marvel Entm't Group, 9 F.3d 237, 239 (2d Cir.

1993), cert. denied, 511 U.S. 1081, 114 S. Ct. 1829, 128 L.Ed.2d 459 (1994).

See also In re Taylor, 655 F.3d at 284 ("The client is not expected to know the

technical details of the law and ought to be able to rely on his attorney to elicit

from him the information necessary to handle his case in the most effective, yet

legally appropriate, manner.").  Mrs. Antonelli cannot be expected to know what

constitutes an improper bankruptcy filing and, absent advice of counsel

otherwise, would not have realized that her petition was improper.  Therefore,

she will not be sanctioned for filing her petition in bad faith.


Mr. Ford cannot claim that he was unaware of the true facts underlying

Mrs. Antonelli's bankruptcy, or that he conducted a reasonable inquiry to

determine that the filing was not for an improper purpose.  He was the attorney

in both Mr. Antonelli's prior bankruptcy and Mrs. Antonelli's previous Chapter

7 filing, having represented the couple since at least 2008.  He was fully aware

of the state court litigation, as evidenced by his correspondence to the state

court judge in his capacity as Mr. Antonelli's bankruptcy attorney.  He knew

that the Property was originally titled to Orion, but was transferred to

Westville.  He knew that the debtor owned the shares of Westville rather than

the Property, which was an asset of Westville.  He knew or should have known

that a corporation cannot be named as a debtor in a Chapter 13 case, that a

Chapter 13 debtor cannot modify a mortgage on property that she does not

own, and that there were no "arrearages" to cure, because at least the first of

the notes was due in full in March 2011.  Not only did Mr. Ford fail to conduct

a reasonable inquiry to determine whether the petition was being filed for

improper purpose, he ignored the information that he either had in his

possession or that was readily available to him that would have clearly

demonstrated that the debtor's Chapter 13 case could not succeed.


Mr. Ford's failure to conduct a reasonable inquiry regarding the factual

contentions in the petition and schedules is particularly apparent in his

treatment of the debtor's income.  He misrepresented the debtor's current

monthly income, defined in the Bankruptcy Code as the average monthly

income that the debtor receives during the six-month period preceding the

commencement of the case, 11 U.S.C. § 101(10A)(A), on the debtor's Official

Form B22C (the so-called "Means Test" form).  The debtor's form reflects that

the average monthly income that she received during the six months preceding

the filing was $2,100, when the debtor only began her employment on or about

April 1.  Astoundingly, notwithstanding the misrepresentation by Mr. Ford on

the Means Test form regarding the debtor's average monthly income during the

last six months, and his inclusion of the debtor's income on Schedule I at the

time the petition was filed, he submitted a letter to the court two months after

filing the case, asserting that he was unaware of the debtor's new working

situation as of April 25, 2011, when the Trust's motion for relief from stay was

heard in court.  (Letter of May 26, 2011, at 4-5).   He also misrepresented Mr.

Antonelli's Social Security income as $1,800, when the testimony of the debtor

was that Mr. Antonelli never received more than $988 per month from Social

Security.

It is obvious under these circumstances that Mr. Ford failed to conduct a

reasonable inquiry of the relevant circumstances, and that his conduct in filing

the petition is therefore sanctionable under Rule 9011.

C.     Nature of Sanction.

Under Rule 9011, a court may "impose an appropriate sanction" that

may include nonmonetary sanctions, penalties paid to the court, or reasonable

attorney's fees and expenses.   FED.R.BANKR.P. 9011(c), (c)(2).   In awarding

sanctions under Rule 9011, a court should award the least severe sanction

that is likely to deter this type of conduct in the future.   In re Schaefer Salt,

444 B.R. at 295 (citing In re Rainbow Magazine, Inc., 136 B.R. 545, 555 (9th

Cir. B.A.P. 1992)).   Bankruptcy courts have awarded a variety of sanctions for

violations of Rule 9011, including reprimand or suspension of an attorney,

dismissal of a case, and attorney's fees and costs, 10 COLLIER ON BANKRUPTCY, ¶

9011.08 (Alan N. Resnick & Henry J. Sommer eds., 16th Ed. 2011), as well as

disgorgement of attorney's fees.   E.g., In re Coones Ranch, Inc., 7 F.3d 740,

742 (8th Cir. 1993).  The court may award any attorney's fees and costs that

were a direct result of the Rule 9011 violation.  FED.R.BANKR.P. 9011(c)(1).

The Trust has requested that the court compensate the Trust for

expenses incurred related to the debtor's bankruptcy by "ordering the shifting

of fees and requiring the debtor and Mr. Ford to pay for all attorneys' fees and

costs incurred in this litigation."  Counsel for the Trust has submitted a

schedule of fees and costs related to Mrs. Antonelli's bankruptcy totaling

$21,424.43.  However, "the main purpose of Rule 11 is to deter, not to

compensate."  Egnotovich v. Greenfield Twp. Sewer Auth., 304 Fed. Appx. 94,

98 (3d Cir. 2008).  Keeping this in mind, the court declines to award Mr.

Goodman the entire $21,424.43, as the court believes that such an award is

more severe than is necessary to effect deterrence.  Notwithstanding the

opportunity to award the full amount of fees requested, because all such fees

appear to have been incurred as a direct result of the violation, the court will

order Mr. Ford to pay Mr. Goodman $10,000.00 for attorney's fees expended in

connection with this case.

II.    11 U.S.C. § 105(a) and the Court's Inherent Powers.

In the alternative, the court determines that sanctions may also be

assessed under 11 U.S.C. § 105(a) and the court's inherent powers.  Under §

105(a), the bankruptcy court "may issue any order, process, or judgment that

is necessary or appropriate to carry out the provisions" of Title 11.   11 U.S.C. §

105(a).   The court is authorized, sua sponte, to "tak[e] any action or mak[e] any

determination necessary or appropriate to enforce or implement court orders or

rules, or to prevent an abuse of process."   Id.

It is well established that under 11 U.S.C. § 105(a), a bankruptcy court

has broad powers to implement the provisions of Title 11 and to prevent abuse

of the bankruptcy process.   In re Volpert, 110 F.3d 494, 500 (7th Cir. 1997).

Such orders are necessary "'to protect the integrity of the Bankruptcy Code as

well as the judicial process,'" In re Arkansas Communities, Inc., 827 F.2d

1219, 1222 (8th Cir. 1987) (quoting In re Silver, 46 B.R. 772, 774 (D.Colo.

1985)), and to enable bankruptcy courts "to maintain control of their

courtrooms and of their dockets."   In re Volpert, 110 F.3d at 501.   In order to

protect abuses of the Bankruptcy Code and the judicial process, courts have

the authority to sanction both attorneys and litigants.   In re Collins, 250 B.R.

645, 657-59 (Bankr. N.D. Ill. 2000).   Use of this authority is appropriate when

the bankruptcy is filed not for the purpose of reorganization, but simply to

delay a creditor's state-court remedies.   In re Courtesy Inns, Ltd., 40 F.3d

1084, 1089-90 (10th Cir. 1994).

A federal court may also use its "inherent power to impose attorney's fees

as a sanction for bad-faith conduct."   Chambers v. NASCO, Inc., 501 U.S. 32,

50, 111 S. Ct. 2123, 2135, 115 L.Ed.2d 27 (1991).   Sanctions may be imposed:

33

> when a party has acted in bad faith, vexatiously, wantonly, or for
> oppressive reasons. . . . if a court finds that fraud has been
> practiced upon it, or that the very temple of justice has been
> defiled, it may assess attorney's fees against the responsible party .
> . . . The imposition of sanctions in this instance transcends a
> court's equitable power concerning relations between the parties
> and reaches a court's inherent power to police itself, thus serving
> the dual purpose of vindicat[ing] judicial authority without resort
> to the more drastic sanctions available for contempt of court and
> mak[ing] the prevailing party whole for expenses caused by his
> opponent's obstinacy.

Id. at 45-46, 111 S. Ct. at 2133 (internal quotations omitted).  Rules or statutes

governing sanctions, like Federal Rule of Civil Procedure 11 and 27 U.S.C. §

1927, are not substitutes for the court's inherent authority to sanction, and the

availability of those specific sanction opportunities does not foreclose a court's

invocation of its inherent sanctioning authority.  Id. at 46, 111 S. Ct. at 2134.

Before a court may use its inherent powers to sanction a party or counsel, it

must find that the party acted in bad faith.  In re Schaefer Salt, 444 B.R. at

298 (citing Fellheimer, Eichen,  & Braverman, P.C. v. Charter Tech., Inc., 57

F.3d 1215, 1224 (3d Cir. 1995)).


Most courts have agreed that bankruptcy courts, like Article III courts,

have the inherent power to impose sanctions for improper conduct that is

abusive to the judicial system.  See, e.g., In re Dyer, 322 F.3d 1178, 1196 (9th

Cir. 2003) ("The inherent sanction authority allows a bankruptcy court to deter

and provide compensation for a broad range of improper litigation tactics."); In

re Rimsat, Ltd., 212 F.3d 1039, 1048-49 (7th Cir. 2000) (a bankruptcy court is

"not required to apply available statutes and procedural rules in a piecemeal

34

fashion where only a broader source of authority is adequate to justify all the
necessary sanctions"); In re Downs, 103 F.3d 472, 477 (6th Cir. 1996)
(Attorney's failure to disclose compensation arrangements under Rule 2016
warrants the exercise of the bankruptcy court's inherent authority to
sanction.).  See also Jove Eng'g, Inc. v. I.R.S., 92 F.3d 1539, 1553 (11th Cir.
1996) ("The Supreme Court made clear that these inherent powers arise
independently of any statute or rule."); In re Rainbow Magazine, Inc., 77 F.3d
278, 284 (9th Cir. 1996) ("There can be little doubt that bankruptcy courts have
the inherent power to sanction vexatious conduct presented before the court.");
Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc., 57 F.3d 1215,
1224 (3d Cir. 1995) ("Among the implied and 'incidental' powers of a federal
court is the power 'to discipline attorneys who appear before it.'"); In re
Courtesy Inns, Ltd., 40 F.3d at 1089 ("§ 105 [is] intended to imbue the
bankruptcy courts with the inherent power recognized by the Supreme Court
in Chambers.").

        The ability to impose sanctions under both § 105 and the court's
inherent powers is not unlimited.  A court's authority under § 105 only allows a
court to impose civil sanctions which are compensatory or designed to coerce
compliance.  In re Dyer, 322 F.3d 1178 at 1192; see also Jove Eng'g, Inc., 92
F.3d at 1558 (sanctions are coercive, and not punitive, if they serve the
petitioning party rather than the public interest.).  As noted in Fellheimer,
Eichen & Braverman, P.C. v. Charter Tech., Inc., notice of the precise

sanctioning tool that the court intends to employ to impose a sanction upon a

party or an attorney, as well as an opportunity to be heard regarding the

precise sanctioning tool, must be afforded.  57 F.3d at 1225.  In this case, the

debtor and her counsel had notice of the various sanctioning tools relied upon

by the movant.  As well, they had an opportunity to be heard on the creditor's

charge that all actions of the debtor's counsel in this case, starting with the

filing of the petition and continuing on with the debtor's motion to reinstate,

were carried out in bad faith and without any prospect of a successful

reorganization.

        The indicia of bad faith in the filing of the petition were discussed above.

As to the filing of the debtor's motion for reconsideration of the order granting

relief from the stay to the Trust, the initial certification signed by the debtor

and submitted as the only support for the motion was nonsensical.  The

certification reflected that she has been employed since the beginning of April,

a fact that was noted on her petition, and that, therefore, she would be able to

"catch up" on arrearages.  There were no "arrearages" to "catch up" on.  In a

subsequent submission, Mr. Ford repeated the assertion that debtor's income

was "newly discovered" after the April 25 hearing.  No other grounds for

reconsideration were offered notwithstanding all of the Trust's additional

arguments that supported the court's decision to grant relief from the stay.

The motion for reconsideration was wholly without merit, and served only to

cause additional delay and to increase the cost of the litigation.

For these reasons, alternate bases for imposing sanctions against Mr.

Ford are sustainable under 11 U.S.C. § 105(a) as well as the court's inherent

authority to sanction bad faith conduct.

III.   28 U.S.C. § 1927.

The creditor also seeks sanctions against Mr. Ford and the debtor under

28 U.S.C. § 1927, which states that:

> Any attorney or other person admitted to conduct cases in any
> court of the United States or any Territory thereof who so
> multiplies the proceedings in any case unreasonably and
> vexatiously may be required by the court to satisfy personally the
> excess costs, expenses, and attorneys' fees reasonably incurred
> because of such conduct.

28 U.S.C. § 1927.  In this circuit, a court must find four elements present in an

attorney's conduct before the court can impose sanctions under this provision.

The attorney must have:  "(1) multiplied proceedings; (2) unreasonably and

vexaciously; (3) thereby increasing the cost of the proceedings; and (4) with bad

faith or with intentional misconduct."  LaSalle Nat'l Bank v. First Connecticut

Holding Group, LLC, 287 F.3d 279, 288 (3d Cir. 2002).  While there is some

conflict on this question among the circuits, the Third Circuit has held that the

bankruptcy courts have the authority to impose sanctions under 28 U.S.C. §

1927.  In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 105 (3d Cir. 2008).  Cf.

In re Knauss, 145 F.3d 1338, 1998 WL 276601 (9th Cir. May 22, 1998); In re

Courtesy Inns, Ltd., 40 .3d 1084 (10th Cir. 1994); In re Arkansas Commun.,

Inc., 827 F.2d 1219, 1221 (8th Cir. 1987) (authority is "questionable").


The Third Circuit has not addressed another issue of conflict among the

courts:  whether a court may sanction an attorney for the initial filing of a

bankruptcy petition.  Several courts have held that it is impossible for an

attorney to vexaciously multiply proceedings by filing an initial pleading.  E.g.,

DeBauche v. Trani, 191 F.3d 499, 511-12 (4th Cir. 1999), cert. denied, 529 U.S.

1033, 120 S. Ct. 1451, 146 L.Ed.2d 337 (2000); In re Yagman, 796 F.2d 1165,

1187 (9th Cir. 1986), cert. denied, 484 U.S. 963, 108 S. Ct. 450, 98 L.Ed.2d

390 (1987) ("Section 1927 does not apply to initial pleadings, since it addresses

only the multiplication of proceedings.  It is only possible to multiply or prolong

proceedings after the complaint is filed.").  Other courts have held that

sanctions may be imposed when a party, who has not succeeded in a prior

action, files a second action.  E.g. Hagerty v. Succession of Clement, 749 F.2d

217, 219 (5th Cir. 1984), cert. denied, 474 U.S. 968, 106 S. Ct. 333, 88 L.Ed.2d

317 (1985) (when state supreme court refused to consider an appeal for the

fourth adjournment of a trial, sanctions could be granted for bringing an action

under 42 U.S.C. § 1983).  A bankruptcy court for the District of New Jersey has

imposed sanctions for filing a bare Chapter 7 petition five weeks after a bare

Chapter 11 petition was voluntarily dismissed by the debtor.  See In re

Schaefer Salt Recovery, 444 B.R. at 298.


38

On this record, I can readily conclude that the debtor's attorney unreasonably multiplied the proceedings between the debtor and the Trust in bad faith when he filed the debtor's petition and followed it with other unsupportable submissions, thereby substantially increasing the cost of litigation.  When the initial pleading in a case unreasonably extends litigation that is pending in another forum, a court may sanction such conduct under § 1927.  Such is the case here.  The debtor and her husband had previously sought to protect their interest in the Property in state court and through the husband's bankruptcy filing.  By initiating an unsustainable and bad-faith bankruptcy, and by following up with meritless pleadings, the debtor's attorney had no basis to believe that the debtor could reorganize in a Chapter 13 case. Sanctions may be imposed under § 1927 against Mr. Ford, requiring him to pay at least a portion of the costs and attorney's fees that the Trust has incurred defending its interests to the Property in response to the debtor's bankruptcy petition.

## **CONCLUSION**

I conclude that the debtor's petition was filed in bad faith by Mr. Ford. Sanctions may be imposed against Mr. Ford under Rule 9011.  Alternatively, Mr. Ford's actions in this case are sanctionable under § 105(a), the court's inherent powers, and/or 28 U.S.C. § 1927.  Mr. Ford is required to compensate

the Trust $10,000.00 as partial payment of attorney's fees expended in this case.

Counsel for the Trust shall submit an order in conformance with this opinion.

Dated:   January  30, 2012

JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT